IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

B.Z., a minor, by and through his father and next friend, SELIM ZHERKA,
Plaintiff,

v. Case No. 2:26-cv-2773

ROBERT DAWES, individually; and YESENIA GARCIA, individually,
Defendants.

**COMPLAINT FOR DAMAGES**
**JURY TRIAL DEMANDED**

Plaintiff, **B.Z.**, a minor, by and through his father and next friend, **SELIM ZHERKA**, sues Defendants, **Robert Dawes**, individually, and **Yesenia Garcia**, individually, and alleges as follows:

## INTRODUCTION

1. B.Z. is a student at Aubrey Rogers High School which is governed by The School Board of Collier County, Florida (the "District"). The District's 2026–2027 Code of Student Conduct, attached hereto as **Exhibit 1** (hereafter, the "Code" or the "Code of Conduct") instructs and places responsibility on the students not to ignore unsafe or concerning behavior and states: "See it, Say it, Don't spread it, Report it!" (Code p. 5; District Admin. Policy 5600). B.Z. followed that directive by objecting to and reporting Defendant Dawes's conduct he perceived as inappropriate. He was then subjected to escalating discipline as a retaliation that continues to affect him.

2. On Friday September 4, 2026, Assistant Principal Robert Dawes ordered more than 100 students to their knees during a tornado drill and, according to the witnesses identified below, physically directed some students' heads downward. B.Z., a high-school senior, refused to kneel, called the order "creepy," and—in front of school staff—asked whether Dawes was "some creepy pedophile." Dawes imposed no discipline for that exchange and only gave a cryptic warning to B.Z. that he was investigating B.Z. That investigation of Dawes rested upon purported statements B.Z. was said to have made to female students during lunch, which formed the basis of Dawes's escalating disciplinary referrals issued on the very next school day, September 8th, 2026 at 8 a.m.—**first** for "harassment," **then**, on September 9 while B.Z. was at home and already suspended, for "sexual harassment." Nearby witnesses identified below deny hearing the alleged statement, and the video and text-message evidence Dawes later described has never been produced. Before either suspension, B.Z. was not given an explanation of the supporting evidence or a meaningful opportunity to respond. The District's Code and policies expressly require pre-suspension notice, an explanation of the evidence, and an opportunity to be heard. This action seeks damages for First Amendment retaliation and denial of procedural due process, together with attorneys' fees and costs under 42 U.S.C. § 1988.

3. B.Z. is separately seeking injunctive relief in a parallel action in the Circuit Court of the Twentieth Judicial Circuit in and for Collier County, including correction

and expungement of the false disciplinary record under Fla. Stat. § 1002.22(4) and an order barring its disclosure. This federal action seeks damages, and attorney's fees and costs.

## JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction over Counts I, II, and III under 28 U.S.C. §§ 1331 and 1343(a)(3), because those claims arise under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution.

5. To the extent Plaintiff asserts any claim arising under the law of the State of Florida, this Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) because such a claim would arise from the same nucleus of operative fact as the federal claims.

6. Venue is proper in this District and Division under 28 U.S.C. § 1391(b)(2) and Local Rule 1.04 because a substantial part of the events or omissions giving rise to the claims occurred in Collier County, Florida.

7. All conditions precedent to this action have been performed, have occurred, or have been waived.

## PARTIES

8. Plaintiff, B.Z., is a minor, and a senior at Aubrey Rogers High School ("Aubrey Rogers"), a public school in Collier County, Florida. He sues by and through his father and next friend, Selim Zherka, under Fed. R. Civ. P. 17(c).

9. Defendant, **Robert Dawes**, is an Assistant Principal at Aubrey Rogers responsible for attendance and discipline. At all relevant times, he acted under color of state law. Dawes is sued in his individual capacity.

10. Defendant, **Yesenia Garcia**, is the Principal of Aubrey Rogers and held that position at all relevant times. Garcia acted under color of state law and is sued in her individual capacity.

## FACTUAL ALLEGATIONS

### A. A State Placer, a Senior Season, and a College Decision Weeks Away

11. B.Z. has attended Aubrey Rogers since it opened three years ago. He wrestles for the school, is a state placer, and is among the best wrestlers in Florida. Before the events described below, he was scheduled to serve as team captain this season.

12. B.Z. is applying to colleges that combine competitive wrestling with strong academics. After he visited a college in Connecticut (the "Connecticut College") in June 2026 and met with its staff and coaches, its wrestling coach texted B.Z. and his brother that "you guys are top of my list and I'd love to get things moving for you both." B.Z. is seeking an early commitment from the Connecticut College, with a decision expected in November 2026. He is also applying to another university (the "Michigan University") that requires applicants to disclose disciplinary history to its admissions office. The schools are identified by pseudonym to avoid prejudicing B.Z.'s pending applications.

Leaving the sexual-harassment finding unresolved while these decisions are pending threatens substantial educational and athletic opportunities.

### B. September 4, 2026 Tornado Drill and Dawes's Order for Students to "Get on Your Knees"

13. On Friday, September 4, 2026, during third period, Aubrey Rogers held a tornado drill throughout the school.

14. B.Z. had participated in this drill in past years without incident. As practiced in every prior year, the drill required students only to sit on the ground and then crouch, in the manner depicted in the position illustrated below.



**Figure 1 ("Tornado Crouch Position,"[1])**

15. Assistant Principal Douglas Grimm conducted the tornado drill in the customary manner in Building 6, with students sitting on the ground.

[1] **National Weather Service, 2024 Florida Severe Weather Emergency Plan for a School** (available *https://www.weather.gov/media/jax/stormready_for_schools/2024_Florida_SWEP.pdf, last accessed Oct 8, 2026).*

16. Likewise, Principal Garcia conducted the tornado drill on the first floor of Building 5, where students sat on the ground as they had in prior drills.

17. On the third floor of Building 5, Dawes repeatedly ordered his group of students to "get on your knees." The instruction differed from the drill procedure used by Grimm and Garcia and from the procedure B.Z. had experienced in prior years.

18. Dawes repeated the command while walking among the students. Student witnesses identified below state that Dawes also placed his hands on some students and physically directed their heads downward to secure compliance.

**C. B.Z. Objects, and Dawes Imposes No Discipline**

19. B.Z. sat on the ground, as he had in prior drills. When Dawes ordered B.Z. to get on his knees as Dawes stood in front of B.Z., B.Z. refused and explained that being ordered to kneel is not part of a drill and is "creepy."

20. B.Z.'s objection was consistent with the Code of Conduct, which instructs students not to ignore unsafe or concerning behavior and states: "*See it, Say it, Don't spread it, Report it!*" (Code p. 5; see also Administrative Procedure 5600).

21. The Code's Redress of Grievances section further states that "*[s]tudents have the responsibility to discuss their grievances informally with the persons involved prior to invoking formal grievance procedures.*" (Code p. 9.)

22. Dawes did not discipline B.Z. for refusing to kneel or for calling the order "creepy," although the Code separately addresses insubordination, disruption, and disrespect toward school personnel. (See Code Rules 8, 9, and 20.)

23. Dawes removed B.Z. from the drill and walked him to the main office, angrily telling him, "You defied me" and "you embarrassed me." Dawes was referring to B.Z.'s public refusal, before more than 100 students, to kneel on his order and B.Z.'s statement that the order was "creepy."

24. In the main office, with school staff present and within earshot, Dawes insisted that telling students to get on their knees "*was part of his job*" and "*the rule.*" B.Z. responded, openly and in the presence of staff: "*why do you want us to get on our knees so bad, what are you some creepy pedophile?*"

25. B.Z. was expressing a concern that Dawes's conduct toward students was sexually inappropriate. B.Z. also told Dawes, in substance, that his father—and the parents of other students—would be upset that Dawes had required their children to kneel in that manner.

26. Dawes, visibly irate at the accusation, responded by repeating B.Z.'s allegation in a low, angry tone, stating, "You called me a creepy pedophile." His demeanor, tone of voice, and facial expression reflected clear anger at the accusation.

27. Yet again, Dawes imposed no discipline for that exchange and sent B.Z. back to class. B.Z. had expressed his concern in the presence of Dawes and other school

staff members. No school employee then advised B.Z. that the concern would be referred for investigation or that another administrator would address it.

28. B.Z.'s statement put Dawes and the staff members who heard it on notice that B.Z. was complaining about conduct he perceived as sexually inappropriate. The Code directs students to report sexual misconduct or sexual harassment to an administrator and promises that reporting a complaint will not adversely affect the reporting student's status, extracurricular activities, grades, or work assignments. (Code Rule 28, p. 36; see also Board Policy 5517.)

29. At the conclusion of this interaction in the main office, Dawes asked B.Z., "Do you want to go home or do you want to go back to class?" B.Z. chose to return to class.

### D. District Policies Governing Reports Concerning Employee Conduct

30. By that point, Dawes was both the employee whose conduct B.Z. had challenged and an administrator with authority over B.Z. Policy 5517.01 states that complaints of harassment involving a District employee or other adult against a student will be formally investigated, and it separately prohibits retaliation against a person who reports alleged unlawful discrimination or harassment. (Board Policies 5517 and 5517.01.)

31. Board Policy 5517.01, titled "Bullying and Harassment," further provides:

> "***Submission of a good faith complaint or report of bullying or harassment will not affect the complainant or reporter's future*** *employment,* ***grades, learning****, working environment, or work assignments.*

> *Any written or oral reporting of an act of bullying or harassment shall be considered an official means of reporting such act(s)."*

32. Policy 5517 further states that complaints of harassment involving a District employee or other adult against a student will be formally investigated. B.Z.'s complaint was oral and was made directly to Dawes in the presence of other school staff.

33. Dawes nevertheless remained personally involved in investigating and disciplining B.Z. after B.Z. had challenged Dawes's own conduct. No separate administrator was assigned at that point to address the conflict or independently evaluate B.Z.'s complaint.

34. No administrator advised B.Z. that his complaint concerning Dawes had been referred for investigation. Dawes instead remained involved in the investigation and discipline described below.

**E. The Lunchroom Investigation Begins**

35. After fifth period that day, B.Z. ate lunch with numerous students who sat and stood within several feet of him. L.N., a student who had previously asked to be friends with B.Z., approached the table and conversed with students seated there. B.Z. denies threatening or harassing L.N. and denies making the sexual statement later attributed to him.

36. During sixth period, Dawes pulled B.Z. out of his AP Statistics class and told him only that he was "investigating" an incident in the lunchroom. Dawes did not

tell B.Z. what he was accused of saying or doing, so B.Z. had nothing specific to answer. To the extent B.Z. was able to respond at all, he told Dawes, "nothing happened," and "You're just mad that I said you were acting like a creepy pedophile." Dawes said he would continue investigating B.Z.

37. Critically at issue here as to Dawes's commencement of the lunchroom investigation against B.Z. is Board Policy 5517.01 and its subsection titled "**Parent/Legal Guardian Notification**," which requires notice to be given to parents at the start of any investigation:

> ***The Principal shall promptly report via telephone, email, personal conference****, or by first-class mail* ***the occurrence of any incident of bullying or harassment*** *as defined by this policy* ***to the parents/legal guardians of their child's involvement on the same day an investigation of the incident(s) has been initiated.*** *Notification must be consistent with the student privacy rights under the applicable provisions of the Family Educational Rights and Privacy Act of 1974 (FERPA).*

38. Neither Garcia nor Dawes complied with Board Policy 5517.01 and no calls or notice was given to B.Z.'s parents on September 4.

39. B.Z. completed the school day without having been told the specific lunchroom accusation. At that point, Dawes had told him only that he was investigating a lunchroom incident and would continue the investigation.

40. Garcia later received written communications from B.Z.'s father challenging the investigation, requesting the evidence, and demanding review of the

suspensions. Her conduct after receiving those communications is addressed separately below.

41. Before the lunchroom accusation was disclosed to B.Z., Dawes knew that B.Z. had publicly challenged his conduct as sexually inappropriate. Dawes nevertheless remained the administrator investigating B.Z. and, on the next school day, issued the first disciplinary referral.

### F. September 8: Suspended Without a Charge, Evidence, or a Hearing

42. On Tuesday, September 8, 2026, the first school day after the holiday weekend, Dawes issued a Major Office Discipline Referral at 8:03 a.m. charging B.Z. with "BI HARASSMENT/INSTIGATE", a copy of which is attached hereto as **Exhibit 2**. The foregoing "September 8 Referral" states only that "***Student and peers lured a student over and asked her uncomfortable questions that made her feel harassed***," and lists B.Z.'s "Possible Motivation" as "Obtain Peer Attention."

43. The September 8 Referral identifies no statement B.Z. made and comingles the identity of the speaker: is it B.Z., B.Z.'s peers, or a combination of all who asked a question that made a victim feel uncomfortable. Nevertheless, the September 8 Referral imposed a three-day out-of-school suspension (September 9–11) and a time-out.

44. B.Z. was suspended without any explanation of the supporting evidence and without an opportunity to respond before the suspension was imposed.

45. B.Z. could not formulate a meaningful explanation of the events even if he was asked to do so by Dawes since Dawes did not even identify the purported victim that B.Z. or his peers had lured over and B.Z. could not even defend the statement or question at issue for Dawes did not even tell him what the language at issue was.

46. Dawes's only attempt to reach B.Z.'s parents before the referral issued was a voicemail left at approximately 8:00 a.m.—about three minutes before the referral was issued. B.Z.'s parents received the referral by email after the disciplinary decision had been made. Neither B.Z. nor his parents had been given an explanation of the evidence supporting the suspension before it was imposed.

### G. September 9: "Harassment" Becomes "Sexual Harassment" in B.Z.'s Absence

47. On Wednesday, September 9, 2026, the school presented B.Z. with a "Bullying/Harassment Warning/Agreement" that recited the District's definitions of bullying and harassment and stated that B.Z. was not admitting guilt. Within hours, with no new evidence and no witness interviews, Dawes escalated the matter to a charge of sexual harassment.

48. At 3:04 p.m. that day, while B.Z. was at home serving the first suspension, Dawes issued a second Major Disciplinary Referral charging B.Z. with "SH SEXUAL HARASSMENT." The foregoing "September 9 Referral" is attached hereto as **Exhibit 3**.

It alleges that B.Z. "***asked two separate female students minutes apart at lunch, 'if I put a gun to your mother's head, would you suck my cock?'***"

49. B.Z. did not make such a statement.

50. Moreover, because B.Z. was already out of school serving the first suspension, the September 9 Referral for sexual-harassment was imposed without first giving him notice of the new accusation, an explanation of the supporting evidence, or an opportunity to deny the charge and identify contrary witnesses.

51. As with the prior September 8 Referral, in order for B.Z. to even formulate some sort of cogent response, denial, or rebuttal to such a charge B.Z. could not have done so since no victim or accuser has ever been identified to B.Z. that form the basis of the second September 9 Referral.

52. The sexual harassment charge is false, and it was fabricated by Dawes. Dawes knowingly attributed statements and evidence to him that were not supported as described. Garcia later wrote that B.Z. "*had a very active role*" in the incident while declining the family's requests for the supporting evidence and review. " Garcia's foregoing statement is attached hereto as **Exhibit 4**. Garcia's post-suspension conduct is addressed separately below.

53. Beginning September 10, B.Z.'s father repeatedly disputed the accusation in writing, demanded the evidence and a hearing, and identified students whom he said

contradicted the charge. His September 12 email expressly characterized the allegations as fabricated.

54. The second referral imposed a five-day out-of-school suspension for September 9–15 while B.Z. was absent from school serving the first suspension.

55. The September 9 referral records that B.Z.'s parents were emailed at approximately 3:03 p.m. that afternoon "with updated information with second victim." That referenced email was sent by Dawes and is attached hereto as **Exhibit 5** [hereafter, "Dawes Sep 9 Email"). Dawes Sep 9 Email states in pertinent part the following:

> *"I left a message yesterday about [B.Z.'s] behavior and suspension. I had not heard back so I wanted to email as this situation has grown as another student came forward.* ***I spoke to another victim and witness today and verified the interaction on video where [B.Z.] asked the same question, "If I put a gun to your mother's head would you suck my cock" with a variation of instead asking "give him head." He was not the only student to do this and each student will have their suspension amended and the referral amended.*** *He will now be able to return to school on Wednesday, September 16.* ***I will have another agreement for him to sign agreeing not to speak about this young lady either.***
>
> ***There were also text messages apologizing to her and asking her not to report them which does not put them in the best light."***

56. Dawes's Sep 9 Email to place B.Z. and his parents on notice occurred after B.Z. had already been removed from school under the first suspension and did not provide him an opportunity to answer the new charge before the additional suspension was imposed. Moreover, it is highly unclear if B.Z.

57. Moreover, Dawes's emails and writing style as they pertain to B.Z. are cryptic and do not give any sort of notice as to what specific conduct and whose specific conduct he is placing at issue, B.Z. or the other students or peers. This is clearly evident when Dawes transitions and oscillates between using a pronoun for B.Z. (him) and 3rd person pronouns (e.g. they, their, them) to explain an incident that started with Dawes's allegations that "***Student and <u>peers</u> lured a student over and asked her uncomfortable questions that made her feel harassed***" as indicated in the September 8 Referral and now has expanded to maybe 2 or 3.

58. The District's suspension notice, emailed at 3:03 p.m. under the subject "OUT OF SCHOOL SUSPENSION" and citing Fla. Stat. § 1006.09, states that "a brief and informal meeting has been held by the administration, and the reason for this action was discussed with" B.Z. The foregoing notice is attached hereto as **Exhibit 6.** No such meeting occurred regarding the sexual-harassment charge before the September 9 suspension was imposed, and B.Z. was not given an opportunity to deny the new charge or present his side before the sanction took effect.

59. Dawes's Sep 9 Email also stated that he would "have another agreement for [B.Z.] to sign agreeing not to speak about this young lady either." However, no such agreement has ever been distributed or circulated by Dawes.

60. The continuation of that wrongful suspension was perpetuated by Garcia when she falsely asserted that B.Z. "*had a very active role*," during a lunch room incident

that Garcia had no clue based on her own actual investigation. Instead, Garcia casted B.Z. falsely to be a prime mover in conduct that never occurred.

**H. The District's Code and Policies Required Pre-Suspension Process**

61. The Code and Board policies expressly require procedural protections before an out-of-school suspension. Policy 5610 defines due process to include "timely and specific oral and written notices of the charges," "an explanation of the reason/evidence supporting such actions," and "an opportunity for the student to be heard prior to the suspension." Policy 5611 likewise requires written notice of the suspension and reasons, together with an opportunity to appear and respond before suspension, and provides that an appeal may be addressed to the Principal. The Code's suspension section additionally requires a student conference with the Principal, notice of the alleged rule violation, a brief summary of supporting facts, and an opportunity to present the student's side. (Board Policies 5610, 5611; Code pp. 7, 14; see also Fla. Stat. § 1006.09(1)(b).) Those protections were not provided before the disputed suspensions:

(a) The Code states: "In cases of serious offenses that may result in an In-School Suspension or Out-of-School Suspension, a student conference shall be held with the Principal," at which the student receives notice of the alleged rule violation, a brief summary of supporting facts, and an opportunity to respond and present his or her side. (Code p. 14.) No student conference with the Principal was held before either disputed suspension.

(b) Policy 5610 and the Code require timely and specific oral and written notice of the charges. (Board Policy 5610; Code p. 7.) The September 8 referral identified no specific statement made by B.Z., and Dawes did not tell B.Z. what words or conduct formed the basis for the harassment charge before imposing the suspension.

(c) Policy 5610 and the Code require an explanation of the reason or evidence supporting the disciplinary action. (Board Policy 5610; Code p. 7.) No explanation of the supporting evidence was given before either suspension. The later explanation referred to video and text-message evidence that has not been shown nor described even in summary.

(d) Policy 5610 and the Code require an opportunity for the student to be heard before suspension or other serious disciplinary action. (Board Policy 5610; Code p. 7.) The September 9 suspension was imposed while B.Z. was at home serving the first suspension and before he had an opportunity to answer the new sexual-harassment charge.

(e) The Code recognizes the right to explain, identify mitigating factors, and tell the student's side of the story. (Code p. 7.) Before the suspensions were imposed, B.Z. was not given an opportunity to deny the specific charges or identify the nearby witnesses who contradicted them.

(f) The Code separately identifies rights associated with an administrative review, including the right to ask questions with a parent and to have a parent, guardian, or attorney present. (Code p. 7.) After the suspensions were imposed, B.Z.'s parents repeatedly demanded a hearing, review, or appeal. No formal administrative review was convened, and no appeal decision by the Principal was provided.

(g) The Code recognizes the right to present evidence and, at an administrative review, supplemental evidence relevant to the issues being reviewed. (Code p. 7.) One nearby witness states that Dawes interviewed him; the remaining identified witnesses state that Dawes did not interview them. No appeal or review was provided in which B.Z. could present those witnesses after the suspensions were imposed.

(h) The Code recognizes "[t]he right to an impartial review." (Code p. 7.) Dawes remained the administrator investigating and charging B.Z. after B.Z. had publicly challenged Dawes's own conduct.

62. Notwithstanding the non-existence of the evidence, the only "explanation of the evidence" Dawes ever offered came after the suspension had been imposed.

63. Rule 28 of the Code defines sexual harassment to include conduct "carried out by school employees," tells students to "report any sexual misconduct or sexual harassment to an administrator," and promises that "[r]eporting of a complaint will not

adversely affect the reporting student's status, extracurricular activities, grades or work assignments." (Code at 36).

**COUNT I – 42 U.S.C. §1983: First Amendment Retaliation (against Dawes, individually)**

64. B.Z. realleges and incorporates paragraphs 1 through 63.

65. B.Z. engaged in protected speech on September 4, 2026, when he objected that Dawes's order to kneel departed from the drill and was "creepy"; when he stated that parents would object to the manner in which Dawes required students to kneel; and when, in the presence of staff, he asked whether Dawes was "some creepy pedophile," thereby expressing a concern that Dawes's conduct toward students was sexually inappropriate.

66. B.Z.'s speech caused no material or substantial disruption of school operations. Dawes imposed no discipline for the exchange and sent B.Z. back to class. B.Z.'s characterization of the order as "creepy" was an expression of opinion based on the circumstances he observed during the drill.

67. Dawes heard B.Z.'s speech himself. He repeated it back to B.Z. ("You called me a creepy pedophile"), and told B.Z. he had "defied" and "embarrassed" him.

68. Dawes then took adverse action against B.Z.: within 2 school days, September 8 and 9, he issued two escalating disciplinary referrals, imposed two out-of-school suspensions, and caused or participated in an athletic suspension for "sexual harassment." Branding a student with a false sexual-harassment charge, suspending him

from school, and stripping his athletic eligibility would deter a student of ordinary firmness from speaking out.

69. B.Z.'s protected speech was a substantial and motivating factor in Dawes's adverse actions. Before the lunchroom incident occurred, Dawes told B.Z. that B.Z. had "defied" and "embarrassed" him and repeated B.Z.'s accusation back to him. Within hours, Dawes pulled B.Z. from class and began investigating the lunchroom incident. During that encounter, B.Z. told Dawes, "You're just mad that I said you were acting like a creepy pedophile," and Dawes nevertheless continued as the investigator. Dawes issued the first disciplinary referral on the first school day after B.Z.'s speech and escalated the charge the following day.

70. The circumstances support an inference of pretext and retaliatory motive. The first referral identified no specific statement made by B.Z.; the charge was escalated the following day; the video and text-message evidence Dawes described has not been produced; several nearby witnesses contradict the accusation; Dawes remained the investigator after B.Z. challenged his conduct; and the athletic consequence imposed on B.Z. appears to have differed from that imposed on other students accused in connection with the same incident.

71. The District's Code directed students to "report any sexual misconduct or sexual harassment to an administrator" and promised that "[r]eporting of a complaint will not adversely affect the reporting student's status, extracurricular activities, grades

or work assignments." (Code p. 36.) Board Policy 5517 separately prohibits retaliation against a person who reports alleged unlawful discrimination or harassment. B.Z. contends that these written directives reinforce the clearly established prohibition against retaliation for protected speech and that Dawes acted intentionally and maliciously, entitling B.Z. to compensatory, nominal, and punitive damages and to attorneys' fees and costs under 42 U.S.C. § 1988.

72. B.Z. continues to suffer harm from each and every harm and has been damaged by the actions of the defendants and continues to be damaged by actions of the Defendants as it directly and definitively impacts his standing amongst his peers, having been labeled a sexual harasser directly interferes with his collegiate prospects, has already impacted his ability to pursue his athletic recognition at the state level tournaments and high school level captaincy, and more.

**COUNT II – 42 U.S.C. § 1983**
**Fourteenth Amendment Due Process Violation**
**(Against Defendant Dawes, Individually)**

73. B.Z. realleges and re-incorporates paragraphs 1 through 63.

74. B.Z. has a protected property interest in his public education. Dawes deprived B.Z. of school attendance through the challenged out-of-school suspensions and imposed a stigmatizing sexual-harassment designation that allegedly produced additional reputational and athletic consequences.

75. Before suspending a student, the Due Process Clause requires, at a minimum, notice of the charges and, if the student denies them, an explanation of the evidence and an opportunity to present his side of the story. B.Z. denied the accusation from the outset, telling Dawes that "nothing happened." The Code and Fla. Stat. § 1006.09(1)(b) require at least as much.

76. The District's Code and policies required those protections. B.Z. was given the September 8 suspension without an explanation of the supporting evidence or an opportunity to answer the specific accusation. The September 9 sexual-harassment suspension was imposed while he was already out of school, before he received notice of the new charge, an explanation of the evidence, or an opportunity to respond. No Principal appeal decision was thereafter provided despite written demands for review. (Board Policies 5610, 5611; Code pp. 7, 14.)

77. The explanation Dawes later provided—that he had verified an interaction on video and that text messages existed—came after the suspension was imposed. Moreover, that explanation of Dawes did not identify or attribute anything specific to B.Z. and comingled B.Z. with potential other actors.

78. Despite repeated requests, the described video and text-message evidence has not been produced to B.Z. or his parents. The timing therefore did not satisfy the pre-suspension requirement that B.Z. receive an explanation of the evidence and an opportunity to respond.

79. Dawes also remained personally involved in investigating and disciplining B.Z. after B.Z. had publicly challenged Dawes's own conduct. Before the lunchroom incident, Dawes told B.Z. that he had "defied" and "embarrassed" him and repeated B.Z.'s "creepy pedophile" accusation back to him. Dawes thereafter served as investigator and issued the disputed referrals. The Code separately recognizes a right to an impartial review. (Code p. 7.)

80. The District's procedures afforded a parent the right to appeal a suspension to the Principal. (Board Policy 5611; Code p. 14.) B.Z.'s parents repeatedly requested a hearing, review, or appeal while the suspension remained in effect, but no appeal decision by the Principal was provided. The suspensions were fully served by September 15, 2026. B.Z.'s parallel state action under Fla. Stat. § 1002.22(4) concerns correction and confidentiality of education records and does not seek damages for the completed federal constitutional deprivation alleged here.

81. B.Z.'s parents demanded a hearing, review, or appeal in writing on September 10, 11, and 14 and directed those requests to the Principal and District leadership. No Principal appeal decision was provided. The requirements of pre-suspension notice, an explanation of the evidence, and an opportunity to be heard were stated in the Code, Policy 5610, Policy 5611, and Fla. Stat. § 1006.09(1)(b). B.Z. contends that Dawes is not entitled to qualified immunity for denying those protections.

82. As a direct result, B.Z. suffered the damages described above, entitling him to compensatory, nominal, and punitive damages and to attorneys' fees and costs under 42 U.S.C. § 1988.

**COUNT III – 42 U.S.C. § 1983**
**Fourteenth Amendment Due Process Violations (Against Defendant Garcia, Individually)**

83. B.Z. realleges and incorporates paragraphs 1 through 63.

84. Garcia is sued for her own conduct as Principal. The Code places responsibility on the Principal to conduct the student conference preceding an out-of-school suspension, and both the Code and Policy 5611 provide that a parent may appeal a suspension to the Principal. (Code p. 14; Board Policy 5611.) By September 10, while the five-day suspension remained in effect, Garcia had received written demands for the evidence and a hearing or review and had been told that multiple students contradicted the charge. She did not issue an appeal decision or convene a review before the suspension expired. At the time Garcia withheld that review, B.Z. remained deprived of present interests: the five-day out-of-school suspension was still being served, and the athletic-eligibility suspension on which Garcia was copied had just issued. The process Garcia declined to provide was therefore pre-deprivation process the Code promised while the deprivation was ongoing, not merely a post-hoc correction of a completed sanction. She later asserted that B.Z. "had a very active role" while declining to provide

the requested evidence. She later asserted that B.Z. “had a very active role” while declining to provide the requested evidence.

85. On September 14, Garcia wrote that the matter had been “carefully reviewed” and that Dawes’s investigation included “multiple witnesses and witness statements which I have reviewed.” By then, B.Z.’s father had repeatedly requested the evidence and an appeal or hearing. Garcia did not provide an appeal decision or a forum in which B.Z. could answer the evidence she said she had reviewed.

86. Garcia maintained the suspension through its expiration without issuing the Principal appeal decision contemplated by Policy 5611 and Code p. 14, despite written requests made while the suspension remained in effect. B.Z. contends that the governing procedural requirements were clearly established and that Garcia is not entitled to qualified immunity for her own role in withholding the available review.

87. As a direct result, B.Z. suffered the damages described above, entitling him to compensatory, nominal, and punitive damages and to attorneys’ fees and costs under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff B.Z. respectfully requests that the Court:

A. Award B.Z. compensatory, nominal, and punitive damages against Defendant Dawes on Counts I and II, and against Defendant Garcia on Count III, in amounts to be determined at trial.

B. Award attorneys' fees and costs under 42 U.S.C. § 1988 on Counts I, II, and III.

C. Award pre- and post-judgment interest as permitted by law; and

D. Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable under Fed. R. Civ. P. 38(b).

Respectfully submitted,

**NJ LAW PLLC**
*Counsel for B.Z., a minor, by and through father and next friend, Selim Zherka*
4501 Tamiami Trail N., Ste. 419
Naples, FL 34103
Tel: (239) 920-5228 / Fax: (239) 920-5289

By: */s/ Nabil Joseph*
NABIL JOSEPH
Florida Bar Number: 1012159
Primary: nabil@njlawflorida.com
Service: service@njlawflorida.com
DANIELLE CROWLEY
Florida Bar Number: 1037776
Primary: danielle@njlawflorida.com
Service: service-dc@njlawflorida.com